## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | C.A. NO. _____ |
| v. | ) ) ) | |
| CANYON GROUP LLC, a Delaware limited liability company, and NISSAN CHEMICAL INDUSTRIES, LTD., a Japanese corporation, | ) ) ) ) ) | PUBLIC VERSION |
| Defendants. | ) ) ) | |

### OPENING BRIEF OF PLAINTIFF IN SUPPORT OF MOTION
### FOR PRELIMINARY INJUNCTION IN AID OF ARBITRATION

OF COUNSEL:

A. Stephens Clay
Georgia Bar No. 129400
Ronald L. Raider
Georgia Bar No. 592192
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530

Tonya R. Deem
NC State Bar No. 23075
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, North Carolina 27101

Dated: April 7, 2005/676979

Richard L. Horwitz, Esquire (#2246)
Arthur L. Dent, Esquire (#2491)
Suzanne M. Hill, Esquire (#4414)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951

## TABLE OF CONTENTS          REDACTED

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................1

   A.  The Necessity for Preliminary Injunctive Relief. ...........................................2

   B.  The Contract Termination Dispute. ................................................................4

II. STATEMENT OF FACTS ...........................................................................................5

   A.  Overview of the Pesticide Industry...............................................................5

   B.  DuPont and Nissan's          Agreement. ................................7

   C.  DuPont and Nissan Enter Into     Agreements...........................................8

   D.  DuPont Has Fulfilled Its Contractual Obligations. ..........................................9

   E.  Nissan and Canyon Group Encroach   **REDACTED**   ...........9

III. ARGUMENT AND CITATION OF AUTHORITIES............................................11

   A.  Preliminary Injunction in Aid of Arbitration is Particularly Critical When, as in This Case, The Underlying Matter Involves a Breach of        Rights..........................................................................11

      1.  This Court Has Jurisdiction to Issue a Preliminary Injunction to Preserve The Status Quo While The Parties Arbitrate DuPont's       ...............................................................11

      2.  The Traditional Factors for Issuing Preliminary Injunctions Apply Equally to Applications for Injunctions in Aid of Arbitration. ............................................................................................15

      3.  The Injunction Will Preserve Arbitration and Protect DuPont's       Rights Favor Issuing an Injunction. ...........................................................................................15

IV. CONCLUSION .........................................................................................................21

**REDACTED**

# TABLE OF AUTHORITIES

## Cases

Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs.,
No. Civ.A. 15478, 1999 WL 743479, *11  (Del. Ch. Sept. 10, 1999) ................. 18

American Life Ins. Co. v. Parra,
25 F. Supp.2d 467 (D. Del. 1998) ........................................................................ 12

Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk,
585 F.2d 39 (3d Cir. 1978) .................................................................................. 12

Borden, Inc. v. Meiji Milk Prods. Co., Ltd.,
919 F.2d 822 (2d Cir. 1990) ................................................................................ 12

Carolina Power & Light Co. v. Uranex,
451 F. Supp. 1044 (N.D. Cal. 1977) .................................................................... 12

ContiChem LPG v. Parsons Shipping Co., Ltd.,
229 F.3d 426 (2d Cir. 2000) ................................................................................ 13

Dean Witter Reynolds, Inc. v. Byrd,
470 U.S. 213 (1985) ............................................................................................. 11

E.I. du Pont de Nemours and Co. v. Shell Oil Co.,
498 A.2d 1108 (Del. 1985) .................................................................................. 18

Ferry-Morse Seed Co. v. Food Corn, Inc.,
729 F.2d 589 (8th Cir. 1984) .......................................................................... 13, 20

McCreary Tire & Rubber Co. v. Ceat S.p.A.,
501 F.2d 1032 (3rd Cir. 1974) ............................................................................. 13

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,
460 U.S. 1 (1983) ........................................................................................... 11, 13

Northwestern Nat'l Ins. Co. v. Esmark, Inc.,
672 A.2d 41 (Del. 1996) ...................................................................................... 16

Oburn v. Shapp,
    521 F.2d 142 (3rd Cir. 1975)) ............................................................................ 16

Opticians Assoc. of Am. v. Independent Opticians of Am.,
    920 F.2d 187 (3rd Cir. 1990) .......................................................................... 19

Ortho Pharm. Corp. v. Amgen, Inc.,
    882 F.2d 806 (3d Cir. 1989) ...................................................................... 12, 15

Parfums Givenchy, Inc. v. C&C Beauty Sales, Inc.,
    832 F. Supp. 1378 (C.D. Cal. 1993) ..................................................... 13, 14, 19

Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.,
    175 F. Supp. 2d 1288 (D. Kan. 2001) .................................................... 13, 19

Scherk v. Alberto-Culver Co.,
    417 U.S. 506 (1974) ..................................................................................... 12

Score Board, Inc. v. Upper Deck Co.,
    959 F. Supp. 234 (D.N.J. 1997) ...................................................... 13, 15, 19, 21

Teradyne, Inc. v. Mostek Corp.,
    797 F.2d 43 (1st Cir. 1986) ......................................................................... 13

Twin City Fire Ins. Co. v. Delaware Racing Assoc.,
    840 A.2d 624 (Del. 2003) ............................................................................ 16

Union County Trust Co. v. Sun Chemical Corp.,
    163 F. Supp. 805 (E.D. Pa.), aff'd, 257 F.2d 810 (3rd Cir. 1958) ......................... 17

Venconsul N.V. v. TIM Int'l N.V.,
    No. 03Civ.5387(LTS)(MHD), 2003 W.L. 21804833, *1 (S.D.N.Y.
    2003) ....................................................................................................... 12

**Statutes**

9 U.S.C. § 203 ..................................................................................................... 12

## Other Authorities

ICC Rules of Arb. ¶¶ 4, 9, 11 .......................................................................................... 14

ICC Rules of Arb. ¶ 23.1 (1998).......................................................................................... 14

ICC Rules of Arb. ¶ 23.2 (1998).......................................................................................... 14

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Beginning in 1982, Plaintiff E.I. du Pont de Nemours and Company ("DuPont") and Defendant Nissan Chemicals Industries Ltd. ("Nissan")

## REDACTED
In part because

are heavily regulated products in the United States, as well as in many other countries, and in part because they were duplicating efforts, DuPont and Nissan entered into a                    Agreement, effective July 30, 1982 that reflects their agreement

Among its key features,

## REDACTED

(Decl. of Thomas J. Harkin in Supp. of Motion for Preliminary Injunction in Aid of Arbitration ("Harkin Decl.") ¶ 21, Ex. C (Agreement ¶ 4).)[1]  The "Territory" is defined

## REDACTED

(Agreement ¶ 1(iii).)  DuPont submits that                    will expire

Until then, the agreement remains in full force

---

[1] Citations to supporting evidence will be in the form "Harkin Decl." followed by the appropriate paragraph or exhibit number and attached hereto as Exhibit 1.  Citations to                will be in the form "Agreement. ¶__").

and effect throughout the Territory.  Nissan, however, insists that

## REDACTED

DuPont has fulfilled and continues to fulfill its obligations under

DuPont

in the United States and throughout the Territory,

under the

## REDACTED

annually generates

A.   .   **The Necessity for Preliminary Injunctive Relief.**

DuPont has suffered and will continue to suffer irreparable harm.  This dispute

arises because in the past several weeks, Nissan and co-defendant Canyon Group

LLC ("Canyon Group") have begun

in breach of DuPont's      rights.  Nissan describes

Canyon Group      [2] purportedly authorized to conduct business in

DuPont's      Nissan and Canyon Group have enlisted support from a

third party,

## REDACTED

[3] Moreover, Nissan and Canyon Group

have solicited distributors, encouraging them to sell

## REDACTED

---

[2]

            (Agmt. ¶ 1(viii).)  The press announcement regarding Canyon Group's formation only
identifies Nissan              as shareholders.
[3] Nissan
name        which it owns.      in countries outside of the Territory under the trademark and trade

2

is a post-emergent            applied after the    **REDACTED**

emerge from the soil.  Agricultural application of            will occur

during                        and then not again until 2006.  To meet that

application schedule, any company marketing the product must secure sales,

formulate and distribute                    (Agreement Decl. ¶ 50.)

DuPont and Nissan have agreed to arbitrate "any dispute arising out of or in

connection with"          in Japan in a proceeding to be overseen by the

International Chamber of Commerce ("ICC").  (Agmt. ¶ 16-2.)          . does not

provide either for interim relief or for expedited proceedings.  DuPont is prepared to

arbitrate the contract dispute in due course.  However, preservation of the status quo

and the protection of the arbitration commitment requires that the Defendants be

preliminarily enjoined

**REDACTED**          until an ICC panel is formed, has

accepted jurisdiction over DuPont's claims, and has dealt with the injunctive relief

claims.  Typically, the ICC requires several weeks or even months to complete such

proceedings.  Otherwise, DuPont's right to meaningful arbitration and DuPont's

rights will be irreparably damaged.

The ICC can only provide interim injunctive relief through an appointed

arbitral panel.  Such appointments and ICC confirmations have the practical effect

that the ICC will be unable to appoint a panel and have the matter briefed and

considered before the dates    **REDACTED**          Accordingly, DuPont

respectfully requests that this Court issue a preliminary injunction in aid of the

parties' arbitration agreement.  The injunction will simply preserve the status quo—

3

DuPont's                          rights—until a duly constituted arbitral panel rules on the issues herein presented.  Unless enjoined, Nissan and Canyon Group will continue to encroach on DuPont's                    and will inflict irreparable harm on DuPont in the form of lost goodwill, lost customers and pricing erosion.

**B.    The Contract Termination Dispute.**

DuPont is likely to prevail on the merits of this dispute, which turns on the proper interpretation of the                    provision, Article 13, in                    The provision states:

**REDACTED**

(Agreement ¶ 13 (emphasis supplied).)

Ignoring the plain language of Article 13, Nissan and Canyon Group contend that

**REDACTED**                                    they argue

that                                    territory for DuPont.  That interpretation is wrong for at least two reasons.

First, the plain, unambiguous language of the Termination provision quoted above supports DuPont's interpretation.

Second, other provisions in                    and a related agreement support DuPont's contract interpretation.  For example,

**REDACTED**

**REDACTED**                     These provisions show the

parties knew how to draft                          provisions.  Had they

wanted such an approach to apply to the expiration of          they would have so

specified.

    In addition to suffering irreparable harm and showing it is likely to prevail on

the merits, the equities and public interest weigh in DuPont's favor.  Courts enforce

rights through injunctions, and here, a preliminary injunction is

warranted.

## II.     STATEMENT OF FACTS

pertains to                **REDACTED**

Pesticides are regulated products in the

United States and elsewhere.  Because the dispute involves a contract pertaining to

the pesticide industry, an overview of the industry is provided for the Court's benefit.

### A.     Overview of the Pesticide Industry.

**REDACTED**              in                          products.

are intended to kill         the growth of   -

without harming productive plants.  (Harkin Decl. ¶ 5.)  When used in formulation

with other ingredients,                          applied after the

has emerged from the soil, will            and will protect numerous

crops.[4] (Harkin Decl. ¶ 17.)    **REDACTED**

like all pesticides, are regulated products in the United States. The

United States Environmental Protection Agency ("EPA") oversees the regulation of

pesticides under the Federal Insecticide, Rodenticide and Fungicide Act ("FIFRA").

No            may be sold lawfully in the United States unless and until the EPA has

approved its registration application. Moreover, state regulatory agencies must

approve a registration application before an            can be sold in that state.

(Harkin Decl. ¶ 7.) Many countries regulate pesticides and have programs similar to

the FIFRA registration process. (Harkin Decl. ¶ 3.)

Typically, the FIFRA registration process requires several years and

considerable expense before a registration application is approved. Id. A registrant

must submit numerous health and environmental toxicity studies, and also conduct

efficacy studies. Id. Additionally, EPA must approve the Confidential Formulation

Statement, which in effect is the recipe for combining the active ingredient,

with other ingredients to facilitate the            efficacy of the product.

Each Confidential Formulation Statement contains proprietary and trade secret

information, and it is not released to the public. (Harkin Decl. ¶ 13.) EPA and state

regulatory agencies must approve the label for each            product.

Deviations from the approved Confidential Formulation Statement or label are

violations of FIFRA. (Harkin Decl. ¶ 15.)

---

[4]

**REDACTED**            (Harkin Decl. ¶ 18.)

# REDACTED

**B.    DuPont and Nissan's                                  Agreement.**

In the early 1980s, DuPont and Nissan                                  with

the expectation their efforts would lead to                      products.  Both had

filed patent applications and both had performed some of the necessary studies

application approved                              (Harkin

Decl. ¶ 20.)  In 1982, DuPont and Nissan entered into            effective July 30,

1982.  (Harkin Decl. ¶ 21, Ex. C.)  The D/LA sets forth the parties' rights, obligations

and  responsibilities                              DuPont  agreed

In  return,  Nissan  agreed

**REDACTED**

(Harkin Decl. ¶ 22.)

Article 13  governs  expiration  of

**REDACTED**

7

**REDACTED**

(Agreement ¶ 13; <u>see also</u> Harkin Decl. ¶ 27.)  The Letter Amendment that includes

the above language clarifies DuPont's understanding as follows:

**REDACTED**

(Harkin Decl. ¶ 28.)

> C.    **DuPont and Nissan Enter Into            Agreements.**

Article 7 of            obliged the parties

**REDACTED**                                    DuPont

and Nissan fulfilled this obligation when they entered into

(Harkin

Decl. ¶ 30, Ex. E.)

**REDACTED**                                Article 11 of the

Agreement provides as follows:

**REDACTED**

11; Harkin Decl. ¶ 31.) In the United States,

## REDACTED

(Harkin Decl. ¶ 32.) DuPont and Nissan entered into a second

agreement

## REDACTED           Agreement"). Id.

### D.    DuPont Has Fulfilled Its Contractual Obligations.

DuPont has fulfilled each and every obligation under            (Harkin Decl.

¶ 33.) DuPont filed registration applications and studies with the EPA

and filed registration applications throughout the Territory and prosecuted those

applications.    (Harkin Decl. ¶ 34.)    DuPont obtained an EPA registration for

## REDACTED

(Harkin Decl. ¶ 35.) As a result of DuPont's substantial and ongoing efforts,

in the United States, more than 40 states, and for

use on over a dozen crops.    Id.    DuPont has expended considerable resources

(Harkin Decl. ¶ 36.)    DuPont filed a trademark registration for its

## REDACTED                        and has marketed the products actively.

Id. Sales from                    generate annual revenues

Id.

### E.    Nissan and Canyon Group Encroach On DuPont's Territory.

Nissan has put in motion                                to DuPont

customers in DuPont's              In late June 2004, Nissan announced that

9

it formed Canyon Group, in partnership                                    (Harkin Decl. ¶

37.)   The                     Agreement was among the contracts channeled to Canyon

Group.  DuPont was amenable to the change in part, because

**REDACTED**

joined Canyon Group.  (Harkin Decl. ¶ 38.)

    DuPont originally perceived the Nissan/Canyon relationship as merely a

change in the distribution of the product from Nissan to DuPont.  DuPont did not

understand the change to affect any of the commitments in                            However, in

November 2004, Nissan notified DuPont as follows:


**REDACTED**                        (Harkin Decl. ¶ 39, Ex.

H.)  Nissan then sought DuPont's consent to allow Nissan to furnish DuPont's

confidential information to Canyon Group

    (Harkin Decl. ¶ 40, Ex. H.)  DuPont refused to

release its confidential information and reminded           that DuPont's

    rights under           remained in full force and effect

(Harkin Decl. ¶ 41, Ex. I.)  Nissan  responded, disagreeing with DuPont's position.

(Harkin Decl. ¶ 42, Ex. J.)

    issued a press release                         announcing it

would offer                    **REDACTED**                    sometime in the

    (Harkin Decl. ¶ 43, Ex K.)  DuPont immediately protested.  (Harkin

Decl. ¶ 44.)   Over the next two months, DuPont, Nissan and Canyon Group

negotiated their differences, to no avail.  Id.   The parties continued to exchange

correspondence and to meet on the dispute through March 2005.  (Harkin Decl. ¶ 44, Ex. L.)

In recent days, DuPont learned                    has begun advertising

**REDACTED**                    (Harkin Decl. ¶ 45.)  Upon information and belief, due to the extensive work required to obtain regulatory approval of new pesticide products, the only way Defendants would be in a position to have                    ready for distribution this spring is if Nissan, without DuPont's consent, furnished DuPont's confidential information to Canyon Group to use in formulating                    (Harkin Decl. ¶ 46.)

DuPont has filed this action as soon as it became clear the parties would not reach a negotiated resolution of their disagreement over the proper interpretation of

**REDACTED**

III.    **ARGUMENT AND CITATION OF AUTHORITIES**

A.    **A Preliminary Injunction in Aid of Arbitration is Particularly Critical When, as in This Case, The Underlying Matter Involves a Breach of Exclusive Rights.**

1.    **This Court Has Jurisdiction to Issue a Preliminary Injunction to Preserve The Status Quo While The Parties Arbitrate DuPont's Exclusive Rights.**

The United States Supreme Court has emphasized the important presumption in favor of arbitration, holding that courts should "rigorously enforce agreements to arbitrate." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985).  The strong federal policy favoring arbitration applies equally to international transactions.  See

Scherk v. Alberto-Culver Co., 417 U.S. 506, 519-20 (1974); Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk, 585 F.2d 39, 44 (3d Cir. 1978).

District courts routinely grant preliminary injunctions in aid of arbitration. See Ortho Pharm. Corp. v. Amgen, Inc., 882 F.2d 806, 812 (3d Cir. 1989) ("[A] district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied."). See also American Life Ins. Co. v. Parra, 25 F. Supp.2d 467, 473 (D. Del. 1998) ("The purpose of a preliminary injunction 'is to preserve the status quo, not to decide the issues on their merits.'") (quoting Anderson v. Davila, 125 F.3d 148, 156 (3d Cir. 1997)).

The power to grant a preliminary injunction in aid of arbitration applies equally to international transactions.[5] See, e.g., Borden, Inc. v. Meiji Milk Prods. Co., Ltd., 919 F.2d 822, 825 (2d Cir. 1990) ("[E]ntertaining an application for [a preliminary injunction] is not precluded by the Convention, but rather is consistent with its provisions and its spirit" for preliminary injunctions, comport with the Convention and the international aim for speedy arbitral decisions and a desire to preserve the possibility of recoveries upon awards.); Carolina Power & Light Co. v. Uranex, 451 F. Supp. 1044, 1051 (N.D. Cal. 1977) (finding that the Convention does not bar attachment pending arbitration); Venconsul N.V. v. TIM Int'l N.V., No. 03Civ.5387(LTS)(MHD), 2003 W.L. 21804833, *1 (S.D.N.Y. 2003) (district courts have the power to entertain requests for injunctive relief in aid of arbitration under the

---

[5] Chapter Two of the Federal Arbitration Act governs arbitrable disputes involving international transactions, including those that fall under the Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), which the United States and Japan both signed. United States district courts have original jurisdiction over actions under the Convention, regardless of the amount in controversy, including requests for injunctive relief in aid of arbitration. 9 U.S.C. § 203.

Convention) (Exhibit 2 hereto); <u>ContiChem LPG v. Parsons Shipping Co., Ltd.</u>, 229

F.3d 426, 432 (2d Cir. 2000) (granting maritime attachment to aid a Convention

governed arbitration); <u>Teradyne, Inc. v. Mostek Corp.</u>, 797 F.2d 43, 51 (1st Cir. 1986)

("[T]he congressional desire to enforce arbitration agreements would be frequently

frustrated if the courts were precluded from issuing preliminary injunctive relief to

preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the

arbitration process.").[6]

  Preliminary injunctions are often granted to preserve the status quo while the

parties "litigate" **REDACTED** dispute. <u>See, e.g.</u>, <u>Score Board, Inc. v. Upper</u>

<u>Deck Co.</u>, 959 F. Supp. 234, 240-41 (D.N.J. 1997) (issuing preliminary injunction

enjoining competitor from selling items autographed by baseball player in licensee's

exclusive territory); <u>Ferry-Morse Seed Co. v. Food Corn, Inc.</u>, 729 F.2d 589, 591-92

(8th Cir. 1984) (affirming preliminary injunction enjoining licensor from breaching

license agreement); <u>Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.</u>, 175 F.

Supp. 2d 1288, 1295 (D. Kan. 2001) (denying motion to dismiss claims for injunctive

relief in action arising out of defendant's failure to prevent a third party from shipping

Pepsi products into plaintiff's exclusive territory); <u>Parfums Givenchy, Inc. v. C&C</u>

<u>Beauty Sales, Inc.</u>, 832 F. Supp. 1378 (C.D. Cal. 1993) (affirming permanent

---

[6] The only Third Circuit decision addressing pre-arbitral relief that DuPont has identified is <u>McCreary Tire</u> <u>& Rubber Co. v. Ceat S.p.A.</u>, 501 F.2d 1032 (3rd Cir. 1974), a case predating the Supreme Court's decision in <u>Moses H. Cone Memorial Hospital</u>—a seminal case marking a shift towards effective enforcement of arbitration agreements. <u>McCreary</u> is inapplicable here because the relief sought in that case was not to aid arbitration or to maintain the status quo. Instead, the relief involved pre-arbitration attachment of assets in the United States against an Italian corporation with sufficient assets worldwide to pay any arbitral award against it.

injunction enjoining defendant from importing Amarige perfume into plaintiff's exclusive market).[7]

Preliminary injunctive relief is particularly appropriate in this case because the ICC Rules do not provide a mechanism for granting injunctive relief quickly enough to preserve DuPont's ⌇⌇⌇ rights.[8]  Specifically, under ICC Rules,[9] only the appointed and confirmed Arbitral Tribunal has authority to grant interim relief—not the ICC itself.  ICC Rules of Arb. ¶ 23.1 (1998).  However, before any Arbitral Tribunal can consider a request for injunctive relief, it must be nominated by the parties and confirmed—a process that requires significant time and cooperation among the parties.  See ICC Rules of Arb. ¶¶ 4, 9, 11.  Because of the time involved in commencing an ICC arbitration, confirming an Arbitral Tribunal and having the Tribunal consider requests for interim relief, the ICC Rules specifically provide that "the parties may apply to any competent judicial authority for interim or conservatory measures."[10]  ICC Rules of Arb. ¶ 23.2 (1998).  For the limited and temporary purposes of preserving the status quo until an arbitrator decides the issue, this Court should follow United States law, which clearly grants such relief where appropriate.

**REDACTED**

---

[7]  While this opinion relates to the issuance of a permanent injunction, the court noted that a preliminary injunction had been entered earlier in the case. 832 F. Supp. at 1382.

[8]  As indicated above, to meet this year's                application schedule, Nissan, Canyon Group and their agents or contract partners,

**REDACTED**

[9]  A true and correct copy of the ICC Rules are attached hereto as Exhibit 3.

[10]  In recognition of the inherent delay in obtaining injunctive relief through international arbitration panels, other courts have issued injunctive relief either prior to or contemporaneously with the commencement of an arbitration.  For example, when Heineken filed for arbitration before the International Chamber of Commerce in Paris against Quilmes Industrial S.A., the Argentine brewer, and its parent, Beverage Associates Corp., it simultaneously filed with the court in Luxembourg, where Quinsa is incorporated, a request for an interim injunction pending the award of the arbitration tribunal.  See Article attached hereto as Exhibit 4.

2.    **The Traditional Factors for Issuing Preliminary Injunctions Apply Equally to Applications for Injunctions in Aid of Arbitration.**

This Court should "rigorously enforce" the parties' arbitration agreement and issue an injunction to preserve the status quo. Without a court order enjoining Nissan, Canyon Group, and their partners,

**REDACTED**    any award that DuPont may receive from the ICC-tribunal will be fundamentally compromised. When ruling on a motion for a preliminary injunction, the Court must consider the following factors:

> (1) Whether the movant has demonstrated reasonable probability of eventual success in the litigation; (2) whether the movant has demonstrated that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the *status quo*; (3) the possibility of harm to other interested persons from the grant or denial of the injunction; and (4) the public interest.

Ortho Pharm. Corp. v. Amgen, Inc., 882 F.2d 806, 812-13 (3d Cir. 1989). These factors strongly weigh in DuPont's favor: Dupont will suffer irreparable harm unless immediate injunctive relief is granted; DuPont is likely to succeed on the merits of its claims; and the equities and public interest favor DuPont.

3.    **The Injunction Will Preserve Arbitration and Protect DuPont's Exclusive Territory Rights Favor Issuing an Injunction.**

(a)    DuPont is Likely to Succeed on the Merits.

"It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." Score Board, Inc. v. Upper Deck Co., 959 F. Supp. 234, 238 (D.N.J. 1997) (quoting

Oburn v. Shapp, 521 F.2d 142, 148 (3rd Cir. 1975)).  DuPont more than meets a *prima facie* showing.

Under


(Agmt. ¶ 6-1, 6-2.)

## REDACTED                    (Agmt. ¶ 13

(as amended in 1984).)


The rules of contract construction are well settled.[11]  Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996).  "Contracts must be construed as a whole, to give effect to the intentions of the parties.  Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."  Id.  Even though parties may disagree as to the correct interpretation of a contract, their disagreement does not create an ambiguity.  Id.  "'Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"  Id. (quoting Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. Super. Ct. 1992)).  See also Twin City Fire Ins. Co. v. Delaware Racing Assoc., 840 A.2d 624, 628 (Del. 2003) (identifying standard rules of construction).

---

[11] These rules apply whether United States or Japanese law control.  For convenience, Delaware law is cited.

The                          provision in          is unambiguous in

calling for      **REDACTED**                (Agmt. ¶ 13.)  A

provision similar to the one in DuPont and Nissan's agreement has been broadly

interpreted and enforced to include both foreign and domestic patents.  In Union

County Trust Co. v. Sun Chemical Corp., 163 F. Supp. 805, 806 (E.D. Pa.), aff'd,

257 F.2d 810 (3rd Cir. 1958), the court construed the following provision:

> The licenses referred to in paragraph 1, paragraph 3 and paragraph 10
> hereto shall remain in full force and effect from the date of this
> agreement, or the effective date of the license as the case may be, and
> throughout the life that patent covered or which may be covered by this
> agreement and which is the last to expire.

The court held the defendant was obliged to include all sales and/or rentals of the

licensed products in its royalty computation until the expiration of the last patent

listed in the agreement, "irrespective of whether the last patent was American or

foreign" issued.  257 F.2d at 810.

A comparison with the other          provisions governing the parties'

relationship further confirms that



**REDACTED**



Given  the  material  economic  significance  of  a

on DuPont's                              rights and the fact

that the parties drafted            **REDACTED**            to govern other

aspects of their relationship, the failure to include            language in

Article 13 "speaks volumes". Active Asset Recovery, Inc. v. Real Estate Asset

Recovery Servs., No. Civ.A. 15478, 1999 WL 743479, *11 (Del. Ch. Sept. 10, 1999)

("Overhead is not an obscure term; AMS's failure to use it expressly speaks

volumes.").[12] See also E.I. du Pont de Nemours and Co. v. Shell Oil Co., 498 A.2d

1108, 1113 (Del. 1985) ("[T]he meaning which arises from a particular portion of an

agreement cannot control the meaning of the entire agreement where such inference

runs counter to the agreement's overall scheme or plan.").

### (b)     DuPont Will be Irreparably Harmed if the Injunction is Not Granted.

In preparation for their            launch of            Nissan, upon

information and belief, has provided DuPont's confidential information to Canyon

Group for use in obtaining regulatory approval            (Harkin

Decl. ¶ 46.) Moreover, Canyon Group            have begun advertising

in crop protection trade magazines such as            **REDACTED**

according to information recently obtained from DuPont's distributors, have been

meeting with distributors and encouraging them to divert DuPont's customers to

and Canyon Group. (Harkin Decl. ¶¶ 47-48, Ex. M.)

**REDACTED**            Canyon Group and Nissan

intend to confuse and divert DuPont customers to its products. Unless an injunction

---

[12] A copy of Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., No. Civ.A. 15478, 1999 WL 743479, *11 (Del. Ch. Sept. 10, 1999), is attached hereto for the Court's convenience as Exhibit 5.

**REDACTED**

is issued to prevent Defendants from violating DuPont's                    DuPont

will lose customers. (Harkin Decl. ¶ 49.) The erosion of good will among customers

and loss of trade are "well-established forms of irreparable harm"—indeed irreparable

harm is presumed. <u>Score Board, Inc. v. Upper Deck Co.</u>, 959 F. Supp. at 240 (issuing

injunctive relief for breach of exclusive license agreement where movant showed that

defendant's solicitation of retailers eroded the movant's relationship with those

customers). <u>See also</u> <u>Opticians Assoc. of Am. v. Independent Opticians of Am.</u>, 920

F.2d 187, 195-97 (3rd Cir. 1990) ("Grounds for finding irreparable injury include loss

of control of reputation, loss of trade, and loss of good will."); <u>Parfums Givenchy,</u>

<u>Inc. v. C&C Beauty Sales, Inc.</u>, 832 F. Supp. at 1378 (finding irreparable harm where

defendant's importation of Amarige perfume threatened to erode plaintiff's exclusive

market and undermine the luxury item image plaintiff had created for the perfume).

For example, in <u>Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.</u>, 175

F. Supp. 2d at 1288, the plaintiff brought a breach of contract action when the

defendant failed to prevent a third party from shipping Pepsi products into plaintiff's

exclusive territory. The court denied defendant's motion to dismiss the claims for

injunctive relief, finding that:

> [W]here a party's conduct is likely to result in further loss of customers
> and customer goodwill, such conduct causes irreparable harm because
> of the difficulty and uncertainty in restoring goodwill among customers
> and regaining business of customers who are and will be induced away.

<u>Id.</u> at 1295 (citation omitted).

In addition to loss of customers and good will, without injunctive relief

DuPont will lose the benefit of the considerable financial and human resources it

invested                              REDACTED                              for

With respect to this point, this case is very similar to <u>Ferry-Morse Seed Co. v. Food Corn, Inc.</u>, 729 F.2d at 589.  There, Food Corn, Inc. ("Food Corn") had developed a unique corn seed and granted Ferry-Morse Seed Co. ("Ferry-Morse") the exclusive license to market the seed.   "Ferry-Morse was extremely interested in the food corn product because it gave it an opportunity to get into a new market ahead of competitors without years of research that would otherwise be necessary.   There were no alternative sources of supply from which Ferry-Morse could obtain the food corn seed." <u>Id.</u>  When Food Corn threatened to market the corn seed to Ferry-Morse competitors, Ferry-Morse brought an action to compel arbitration under the license agreement and moved for a preliminary injunction in aid of the arbitration.  <u>Id.</u> at 590.  In affirming the district court's preliminary injunction award, the Eighth Circuit found that because the seed corn was unique and not available from other sources, if Food Corn provided the seed to Ferry-Morse's competitors, "the favorable marketing position which induced plaintiff to expend substantial sums of money will be destroyed." <u>Id.</u> at 591 n.3.

The same result faces DuPont if Nissan is not enjoined

REDACTED                              and if Defendants are not enjoined

from using DuPont's confidential information.  By                    REDACTED

Canyon Group and Nissan will erode the pricing structure DuPont created to recoup a fair return on its investment.  DuPont will not restore the price erosion.  Manufacturers never do.  As a result, DuPont will not be able to earn reasonable returns on its investments.

20

In sum, allowing Canyon Group and Nissan     **REDACTED**

**REDACTED**     before     will harm DuPont's

legitimate business interests and expectations. That harm is not compensable through

monetary relief, whereas any harm the Defendants might suffer if enjoined is slight

and might be compensated with monetary damages.

> (c)     **The Public Interest Favors Issuance of a Preliminary Injunction.**

Even though this dispute concerns private contractual rights, DuPont's

requested injunction furthers the public interest by preventing Canyon Group and

from interfering with DuPont's legally protected contractual rights.

Additionally, this precedent might deter similar interference in the future. See Score

Board, Inc. v. Upper Deck Co., 959 F. Supp. at 240 (public interest is furthered by

preservation of contractual rights and deterrence of future action).

## IV.     CONCLUSION

For the foregoing reasons, DuPont respectfully requests that this Court grant

its Motion for Preliminary Injunction and enjoin Nissan, Canyon Group, and their

contractual partners,

**REDACTED**

21

# REDACTED

until a duly appointed ICC Tribunal has issued a decision relative to whether the exclusivity provisions remain in full force and effect.


OF COUNSEL:

A. Stephens Clay
Georgia Bar No. 129400
Ronald L. Raider
Georgia Bar No. 592192
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530

Tonya R. Deem
NC State Bar No. 23075
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, North Carolina 27101

Dated: April 7, 2005/676979

POTTER ANDERSON & CORROON LLP

By _____
Richard L. Horwitz, Esquire (#2246)
Arthur L. Dent, Esquire (#2491)
Suzanne M. Hill, Esquire (#4414)
Hercules Plaza, 1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951

# EXHIBITS
# 1 THRU 5

# REDACTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I, Richard L. Horwitz, hereby certify that on April 14, 2005, the attached

document was served via hand delivery and electronically filed with the Clerk of the

Court using CM/ECF which will send notification of such filing(s) to the following and

the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899-0551


I hereby certify that on April 14, 2005, I have emailed the documents to the

following non-registered participant at the following address:

Larry  Miller
Canyon Group, LLC
370 S. Main Street
Yuma, AZ  85364


By:  _____
Richard L. Horwitz
Suzanne M. Hill
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
shill@potteranderson.com

677459